HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

1    BRETT J. WILLIAMSON (SB # 145235)
        (bwilliamson@omm.com)
2    JOHN C. KAPPOS (SB # 171977)
        (jkappos@omm.com)
3    CAMERON W. WESTIN (SB # 290999)
        (cwestin@omm.com)
4    BO. K. MOON (SB # 268481)
        (bmoon@omm.com)
5    BRADLEY M. BERG (SB # 300856)
        (bmberg@omm.com)
6    O'MELVENY & MYERS LLP
     610 Newport Center Drive, 17th Floor
7    Newport Beach, California  92660
     Telephone: (949) 823-6900
8    Facsimile:  (949) 823-6904

9    Attorneys for HULU, LLC

10                  **UNITED STATES DISTRICT COURT**

11                  **CENTRAL DISTRICT OF CALIFORNIA**

12

13   SOUND VIEW INNOVATIONS,           Case No.  LA CV17-04146 JAK
14   LLC,                              (PLAx)

15                   Plaintiff,        **DEFENDANT HULU, LLC'S**
                                       **NOTICE OF MOTION TO**
16                                     **EXCLUDE THE TESTIMONY OF**
           v.                          **MR. DAVID YURKERWICH AND**
17                                     **MEMORANDUM OF POINTS AND**
     HULU, LLC,                        **AUTHORITIES IN SUPPORT**
18                                     **THEREOF**
                     Defendant.
19                                     Hon. Judge John A. Kronstadt

20   _____       Date:  April 15, 2019
                                       Time: 8:30 a.m.
21   HULU, LLC,                        Courtroom No.:  10B
                                       Discovery Cutoff:  February 11, 2019
22                   Counter-          Trial Date: TBD
                     Claimant,
23                                     **REDACTED VERSION OF**
           v.                          **DOCUMENT PROPOSED TO BE**
24                                     **FILED UNDER SEAL**
     SOUND VIEW INNOVATIONS,
25   LLC,

26                   Counter-
                     Defendant.
27

28

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

TO PLAINTIFF SOUND VIEW INNOVATIONS, LLC AND ITS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on April 15, 2019, at 8:30 a.m., Defendants Hulu, LLC ("Hulu") will bring for hearing its Motion To Exclude the Testimony of Mr. David Yurkerwich, before the Honorable John A. Kronstadt, in Courtroom 10B at First Street Courthouse, 350 W. First Street, Los Angeles, CA 90012.

Hulu, by and through their undersigned counsel, hereby moves this Court pursuant to Fed. R. Evid. 702 to exclude Mr. Yurkerwich's testimony regarding the appropriate damages should the asserted patents in this action be found to be valid and infringed.

This Motion is based on the attached memorandum of points and authorities, the Omnibus Declaration Of Cameron W. Westin and accompanying exhibits, the Declarations of Dr. Mark Crovella, Dr. Jeffrey Chase, and Mr. Michael Jeffords and documents submitted therewith, any matters of which this Court may take judicial notice, and such additional evidence or argument as may be presented at or before the hearing on this matter.

This Motion is made following a conference of counsel pursuant to Local Rule 7-3 on February 25, 2019.

Dated:  March 4, 2019                    Respectfully submitted,

                                         O'MELVENY & MYERS LLP
                                         BRETT J. WILLIAMSON
                                         JOHN C. KAPPOS
                                         CAMERON W. WESTIN
                                         BO K. MOON
                                         BRADLEY M. BERG

                                         By  */s/ Brett J. Williamson*

                                         Attorneys for Defendant and
                                         Counter-Claimant
                                         HULU, LLC

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION .................................................................. 1

II. FACTUAL BACKGROUND ................................................ 2

    A. The Accused Services .............................................. 2

    B. Sound View's Allegations ....................................... 3

    C. Mr. Yurkerwich's Opinions ................................... 4

III. LEGAL STANDARD ........................................................ 6

IV. ARGUMENT ..................................................................... 8

    A. Mr. Yurkerwich's "Alternate" Calculations Show That His Damages Opinions Include Non-accused Products ........................... 9

    B. Mr. Yurkerwich Applies A Dubious "Efficiency Factor," Calculated For Only One Hulu Program To Hulu's Entire Mobile And Web Division ................................ 11

    C. Mr. Yurkerwich Purports To Calculate The Value Of "Adaptive Streaming" In Moving Cars With No Helper Servers, But Ignores Any Alleged Value Of The Patented Technology Of The '213 Patent ................................. 13

    D. Mr. Yurkerwich Makes Baseless And Speculative Assumptions About Alcatel-Lucent's Role In The 2010 Hypothetical Negotiation ............................................ 16

    E. Mr. Yurkerwich Copies His Flawed Calculations From The 2010 Hypothetical Negotiation To A 2017 Hypothetical Negotiation Involving Different Parties, Patents, And Technology ............................................. 17

    F. Mr. Yurkerwich Uses The Benefits Of a 2018 Technology To Value The Year 2000 Techniques Of The '074 Patent ...................... 19

    G. Mr. Yurkerwich Relies On a Flawed And Irrelevant 2018 Survey Of Hulu Users To Attempt To Determine The Value Of The '213 Patent To Hulu In A 2010 Hypothetical Negotiation ......... 21

    H. Mr. Yurkerwich Fails To Account For The Difference Between Direct Infringement And Induced Infringement .......................... 22

V. CONCLUSION ................................................................. 24

# TABLE OF AUTHORITIES

**Page**

## CASES

*Apple, Inc. v. Wi-LAN, Inc.*,
  Case No. 14-cv-02235, Dkt. No. 548 (S.D. Cal. Jan. 3, 2019) ...................... 8, 15

*Commonwealth Sci.and Indus. Research Org. v. Cisco Sys., Inc.*,
  809 F.3d 1295 (Fed. Cir. 2015) ......................................................................... 7

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) .................................................................................. 7, 16

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ............................................................................ 7

*Finjan, Inc. v. Sophos, Inc.*,
  244 F.Supp.3d 1016 (N.D. Cal. 2017) ............................................................ 23

*Garretson v. Clark*,
  111 U.S. 120 (1884) ......................................................................................... 8

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
  694 F.3d 51 (Fed. Cir. 2012) ............................................................................ 8

*MicroStrategy Inc. v. Bus. Objects, S.A.*,
  429 F.3d 1344 (Fed. Cir. 2005) ........................................................................ 1

*Multimedia Patent Tr. v. Apple Inc.*,
  2012 WL 5873711 (S.D. Cal. Nov. 20, 2012) ................................................. 1

*Parallel Networks Licensing LLC v. Int'l Business Machines Corp.*,
  2017 WL 1405155 (No. 13-2072 (KAJ) D. Del. Apr. 17, 2017) ...................... 23

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
  904 F.3d 965 (Fed. Cir. 2018) ................................................................. 8, 17

*Princeton Dig. Image Corp. v. Ubisoft Entm't SA*,
  Case No. 1:13-cv-00335-LPS-CJB, "Report and
  Recommendation," ECF No. 341 (D. Del. Dec. 11, 2018) ............................... 1

*Rearden LLC v. Walt Disney Co.*,
  293 F. Supp. 3d 963 (N.D. Cal. 2018) ............................................................ 23

*ResQNet.com, Inc. v. Lansa, Inc.*,
  594 F.3d 860 (Fed. Cir. 2010) ...................................................................... 7, 8

*Riles v. Shell Exploration & Prod. Co.*,
  298 F.3d 1302 (Fed. Cir. 2002) ........................................................................ 8

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) ................................................................. 7, 10

*United States v. 87.98 Acres of Land More or Less in the Cty. of Merced*,
  530 F.3d 899 (9th Cir. 2008) ............................................................................ 7

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

*United States v. Rincon*,
    28 F.3d 921 (9th Cir. 1994) .................................................................. 7

**STATUTES**

35 U.S.C. § 271(b) ............................................................................. 23

**OTHER AUTHORITIES**

https://www.akamai.com/us/en/cdn/ .......................................................... 3

**RULES**

Fed. R. Evid. 702 ..........................................................................2, 6, 7, 24

- iii -

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

# I.    **INTRODUCTION**

Defendant Hulu, LLC ("Hulu") asks the Court to exercise its gatekeeper function under Rule 702 of the Federal Rules of Evidence, to exclude the testimony of Sound View's damages expert, David Yurkerwich.  Mr. Yurkerwich has a history of presenting unsupported opinions that have drawn criticism from federal courts.  For example, in its 2005 *MicroStrategy* opinion, the Federal Circuit quoted the district court in characterizing Mr. Yurkerwich's opinions as follows:

> In the direct, but supportable, terms of the district court, 'this report does not pass the red face test.  It does not pass the *Daubert* test.  It does not pass the Rule 702 test…. I read the report before I read any of the briefs, and I, frankly, was appalled at it.'  Exercising its gatekeeper role, the district court properly excluded [Mr. Yurkerwich's] initial expert report on this basis.

*MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1355 (Fed. Cir. 2005) (*internal quotations and citations omitted*).  This was not the last time that a federal court would exclude Mr. Yurkerwich's opinions.  More recently, the Southern District of California excluded his testimony after he attempted to offer opinions that violated "the entire market value rule" and that relied on "generic industry data [that] is not tethered to the relevant facts and circumstances of the present case." *Multimedia Patent Tr. v. Apple Inc.*, 2012 WL 5873711, at *9 (S.D. Cal. Nov. 20, 2012).  Just this past December, a District of Delaware Magistrate Judge recommended striking Mr. Yurkerwich's opinions ***in their entirety*** after Mr. Yurkerwich, on three separate occasions, attempted to offer opinions too "unreliable" to present to a jury.  *Princeton Dig. Image Corp. v. Ubisoft Entm't SA*, Case No. 1:13-cv-00335-LPS-CJB, "Report and Recommendation," ECF No. 341 at 3, 6, and 10 (D. Del. Dec. 11, 2018) (attached as Exhibit 50).

In the present case, Mr. Yurkerwich relies on non-accused products, irrelevant studies, and speculative assumptions to reach an untenable "reasonable royalty" calculation in excess of $134 million for the four asserted patents.  Sound View cannot meet its burden to establish that Mr. Yurkerwich's opinions are "based

on sufficient facts or data" or are "the product of reliable principles and methods." Fed. R. Evid. 702. Accordingly, the Court should exclude Mr. Yurkerwich's opinions.

## II.     FACTUAL BACKGROUND

### A.     The Accused Services

Hulu, formed on June 11, 2007, has headquarters in Santa Monica, California. Hulu delivers streaming video over the Internet. Since its initial release to the public in March of 2008, Hulu has offered subscription video-on-demand ("SVOD") services, providing on-demand content from its content partners. In May of 2017, Hulu launched its Hulu Live service offering subscribers access to the same TV channels offered through traditional cable providers, delivered through Hulu's streaming platform. Declaration of Michael J. Jeffords, Ex. A ("Jeffords Rpt.") at 6-7. In addition to offering content from content partners, Hulu also develops its own content, such as The Handmaid's Tale and The Looming Tower. *See* Declaration of Cameron W. Westin ("Westin Decl."), Ex. 1 (https://www.hulu.com/press/about/).

Hulu is available on a range of different devices. Hulu has developed web browser-based client software applications that allow Hulu subscribers to play SVOD content through a web browser on, for example, Mac or PC desktop or laptop computers. Ex. 51 at 66:23-67:24; Ex. 39 at 55:23-57:17. Hulu has developed client software applications for many platforms, including Apple and Android portable devices, video game consoles, smart TVs, and other streaming devices. *Id*.

Like many modern streaming services, Hulu delivers streaming content over content delivery networks ("CDNs"). In the delivery of data over the internet, a CDN acts as an intermediary between a content server, also known as the origin, and its end users or clients receiving the data. *See, e.g.,* https://www.akamai.com/us/en/cdn/. Hulu's CDNs "provide the function of

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

1  delivering…large amounts of data to [Hulu's] users and providing the infrastructure

2  to scale that operation or that function."  Ex. 39 at 59:2-8.  A CDN's "edge server"

3  acts as the server responsible for the delivery of content directly to end users.  *Id.* at

4  59:12-60:2.  Hulu currently delivers its SVOD and Live TV content through four

5  different CDN providers.  ███████████████████████████

6  ███████████████████████████████████████████

7  ███████████  *Id.* at 99:25-100:6.  ██████████████████

8  ███████████████████████  *Id.* at 100:7-9.[1]

9         Like many modern streaming services, Hulu delivers streaming content

10  encoded according to the MPEG-DASH standard or the HTTP Live-streaming

11  protocol ("HLS") standard.  *Id.* at 37:2-38:8.  Among other functionality, Sound

12  View's allegations in this case focus on the ability of MPEG-DASH and HLS to

13  provide what Sound View's expert, Dr. Richardson, refers to as "adaptive bitrate

14  streaming."  Ex. 29 at ¶¶ 354, 412, 414.

15         **B.    Sound View's Allegations**

16         Sound View is a non-practicing entity that describes itself as "an intellectual

17  property licensing company."  Dkt. No. 40 at ¶ 1.  Sound View does not sell any

18  products or conduct any research or development.  Ex. 2 at 34:14-17 and 38:9-12.

19  Sound View's only assets are a set of patents that it purchased from Alcatel Lucent

20  in two separate Patent Purchase Agreements in 2013 and 2014.  *Id.* at 33:24-34:8.

21         Sound View's original complaint in this action alleged infringement of six

22  patents:  U.S. Patent Nos. 5,806,062 ("the '062 Patent"), 6,125,371 ("the '371

23  Patent"), 6,502,133 ("the '133 Patent"), 6,708,213 ("the '213 Patent"); 6,757,796

24  ("the '796 Patent"), and 9,462,074 ("the '074 Patent").  Currently, only the '062,

25  '213, '796, and '074 Patents are the subject of the parties' expert reports.  *See* Dkt.

26  No. 59 at 1, Dkt. No. 137.

27

28  ─────────────────
[1] Hulu previously used another CDN, Limelight Technologies.  *Id.* at 101:2-6.

HULU LLC'S  MOTION TO  EXCLUDE THE
TESTIMONY OF DAVID YURKERWICH
CASE NO. LA CV17-04146 JAK (PLAx)

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Sound View alleges that Hulu infringes Claim 14 of the '062 Patent through its use of an open-source third party Javascript programming library called "jQuery" in developing its internal and customer-facing websites.  Ex. 52 at 4.  Sound View alleges that Hulu programmers use jQuery to manipulate the "Document Object Model" or "DOM" of its websites, and that this action infringes Claim 14 of the '062 Patent.  *Id.* at 4-5.

Sound View alleges that Hulu infringes the '213, '796, and '074 Patents (collectively, the "CDN Patents") through its delivery of streaming media encoded according to either the MPEG-DASH or HLS standards and delivered using ***only two*** of the four CDNs Hulu employs:  Akamai and Level 3.  Ex. 34 at 2-3, Ex. 35, Ex. 36, Ex. 37.  For Claim 16 of the '213 Patent and Claims 3 and 9 of the '074 Patent, Sound View contends that Hulu infringes by delivering Hulu SVOD and Hulu Live streaming services.  Ex. 34 at 2-3.  For Claims 1, 7, and 8 of the '213 Patent and all asserted claims of the '796 Patent, Sound View contends that Hulu infringes solely through its delivery of Hulu Live, and not Hulu's SVOD product.  *Id.*

## C.    Mr. Yurkerwich's Opinions

Sound View's counsel, Desmarais LLP, retained Mr. Yurkerwich "on behalf of Sound View to analyze the damages resulting from the alleged patent infringement by Hulu" of the '062, '213, '796, and '074 Patents.  Ex. 53 ¶ 1.  On August 3, 2018, Sound View served its opening expert reports on the issues of infringement and damages.  Dkt. No. 95 at 1.  In his August 3 report, Mr. Yurkerwich opined that the Court should calculate damages based on five separate hypothetical negotiations for the four asserted patents, with "Full Damages" in excess of $172 million, and "Damages Less Licensed CDN" in excess of $134 million:

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Sound View Patent | Hulu Technology | Damages Start Date | Full Damages | Damages Less Licensed CDN | Patent Expiration Date |
|---|---|---|---|---|---|
| '213 | Hulu SVOD | 6/2/2011 | $143,188,469 | $113,854,796 | 3/29/2020 |
| '213 | Hulu Live | 5/2/2017 | $1,658,302 | $485,152 | 3/29/2020 |
| '074 | Hulu SVOD | 10/4/2016 | $15,964,570 | $10,175,600 | 3/29/2020 |
| '796 | Hulu Live | 5/2/2017 | $1,857,021 | $532,295 | 5/15/2020 |
| '062 | jQuery | 6/2/2011 | $9,331,749 | $9,331,749 | 10/17/2015 |

Ex. 53 at ¶ 291.

On November 19, 2018, Sound View served the supplemental expert report of Mr. Yurkerwich, which addressed ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████ Ex. 54 at ¶ 4. Mr. Yurkerwich stated that despite this additional evidence, "the opinions set forth in [his August 3] Expert Report remain unchanged." *Id.* at ¶ 5. However, he also included a summary of Sound View's license agreements to date, illustrating the stark contrast between ████████████ ████████████████████████████ and the $134 million he contends Hulu would have paid to license only four of those patents. *Id.* at ¶ 15. ████████████ ██████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY



Ex. 54 ¶ 15.

On January 24, 2019, on the afternoon before Mr. Yurkerwich was to be deposed in this case and without leave from the Court, Sound View served "Corrected and Alternate Calculations," which included an "Alternate Scenario Damages" number that was still in excess of $101 million, but lower than his previous damages calculations of $172 and $134 million:

| Damages Summary | | | | | | Exhibit 5.5 ALT |
|---|---|---|---|---|---|---|
| Sound View Patent | Hulu Technology | Damages Start Date | Full Damages | 08/03/18 Report Damages | Alternate Scenario Damages | Patent Expiration Date |
| '213 | Hulu SVOD | 6/2/2011 | $143,188,469 | $113,854,796 | $83,898,113 | 3/29/2020 |
| '213 | Hulu Live | 5/2/2017 | $1,658,302 | $485,152 | $366,263 | 3/29/2020 |
| '074 | Hulu SVOD | 10/4/2016 | $15,964,570 | $10,175,600 | $7,858,187 | 3/29/2020 |
| '796 | Hulu Live | 5/2/2017 | $1,857,021 | $532,295 | $408,452 | 5/15/2020 |
| '062 | jQuery | 6/2/2011 | $9,331,749 | $9,331,749 | $9,331,749 | 10/17/2015 |

Ex. 55 at Exhibit 5.5 ALT (red box added to identify "Alternate Scenario Damages").

### III.  LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence governs admission of expert testimony in the federal courts and requires that an expert's specialized knowledge; (a) "will help the trier of fact to understand the evidence or to determine a fact in issue"; (b) "is based on sufficient facts or data"; (c) "is the product of reliable principles and methods"; and (d) results from "reliably appl[ying] the principles and

HULU LLC'S  MOTION TO  EXCLUDE THE
TESTIMONY OF DAVID YURKERWICH
CASE NO. LA CV17-04146 JAK (PLAx)

methods to the facts of the case." Fed. R. Evid. 702 (2011). The trial judge, in the role of gatekeeper, screens expert testimony for compliance with Rule 702. *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 589 (1993).

The Supreme Court has interpreted Rule 702 to require judges to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. The duty falls squarely upon the district court to "act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).

The proponent of expert testimony bears the burden of demonstrating its admissibility. *United States v. 87.98 Acres of Land More or Less in the Cty. of Merced*, 530 F.3d 899, 904 (9th Cir. 2008). In a patent case, a patentee bears the burden of proving damages, and "[t]o properly carry this burden, the patentee ***must 'sufficiently [tie the expert testimony on damages] to the facts of the case.*'" *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) (*quoting Daubert*, 509 U.S. at 591) (emphasis added).

The Ninth Circuit has recognized "the powerful nature of expert testimony, coupled with its potential to mislead the jury." *United States v. Rincon*, 28 F.3d 921, 926 (9th Cir. 1994). Expert opinions relating to patent damages are to be analyzed with particular caution; "given the great financial incentive parties have to exploit the inherent imprecision in patent valuation, courts must be proactive to ensure that the testimony presented—using whatever methodology—is sufficiently reliable to support a damages award." *Commonwealth Sci. and Indus. Research Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015). Accordingly, because damages opinions are typically based on a hypothetical negotiation, "a reasonable royalty analysis requires a court to hypothesize, ***not to speculate***." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) (emphasis added). The Court "must carefully tie proof of damages to the claimed invention's

footprint in the marketplace." *Id.* Evidence unrelated to what the patentee has actually claimed (i.e., evidence of non-accused functionality) is irrelevant to the damages inquiry. *Id.* Because, "[a] patentee is only entitled to a reasonable royalty attributable to the infringing features," the patentee "'must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features.'" *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018) (*quoting Garretson v. Clark*, 111 U.S. 120, 121 (1884)).

At all times, "[a] damages theory must be based on 'sound economic and factual predicates.'" *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (*quoting Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002)). If it is not, the testimony should be excluded. *Id.* For example, in a recent case in the Southern District of California, the Court excluded the damages expert's testimony because that expert's "starting point" was an aspect of the *accused* technology, "not the patented technology." *Apple, Inc. v. Wi-LAN, Inc.*, Case No. 14-cv-02235, Dkt. No. 548, Slip Op. at 7 (S.D. Cal. Jan. 3, 2019) (attached hereto as Exhibit 56). While the plaintiff's use of this technology "to prove infringement" may have been appropriate, "taking that theory and simply importing it into the damages case was not." *Id.* at 8. Moreover, the plaintiff's damages expert based his opinion on a comparison of the accused technology to an existing technology, and this test "did not mention the [asserted] patent or equate its benefits" with the benefits of the accused technology. *Id.* Finally, rather than alleging that the patented technology was "equivalent to" the technology used to perform a valuation, the plaintiff merely asserted that it was "related to" it. *Id.* at 9.

## IV.   ARGUMENT

Mr. Yurkerwich applies flawed methodology throughout his report on damages. This flawed methodology starts with Mr. Yurkerwich's initial vast overreach, claiming that Sound View is entitled to damages on non-accused

products, and continues to his specific allegations under each patent, which are based on adopting wholesale studies from third parties about technology that is not covered by the patents-in-suit.  Mr. Yurkerwich's report is little more than an attempt to stretch his damages number to exceed the "nine-figure range" of damages that Sound View has aspired to extract from the outset of this case.  *See* Dkt. No. 45 at 5.  As has been the case with his previous opinions on damages, Mr. Yurkerwich relies on flawed underlying data and utilizes unreliable methodology to reach his inflated damages number, ███████████████████████████████ ████████████████████.

### A.    Mr. Yurkerwich's "Alternate" Calculations Show That His Damages Opinions Include Non-accused Products

Mr. Yurkerwich's August 3 opinion ignores the facts of this case.  This is evident because his opinion alleges damages based on activity by Hulu that Sound View has not accused of infringement, nor offered any evidence to support alleged infringement.  This fundamental overreach demonstrates that the Court should exclude Mr. Yurkerwich's August 3 opinions on damages stemming from the three CDN Patents.

On the day before Mr. Yurkerwich's deposition in this case, Sound View served "Corrected and Alternate Calculations" to Mr. Yurkerwich's report, which alleged "Alternate Scenario Damages."  These "Alternate Scenario Damages", while still in excess of $101 million, were significantly lower than his previous damages calculations of $172 and $134 million.  Ex. 55 (Yurkerwich Corrected and Alternate Calculations) at Exhibit 5.5.  At his deposition the following day, Mr. Yurkerwich testified that the choice between the August 3, 2018 damages number and the January 24, 2019 "Alternate Scenario Damages" ████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████.



Ex. 57 at 189:2-18 (emphasis added).

Sound View, however, has advanced *no evidence* in this case that Hulu's delivery of streaming content over Amazon's CloudFront CDN or Verizon's EdgeCast CDN infringes any of the asserted patents.  Sound View's infringement contentions do not allege infringement by Amazon's or Verizon's CDNs.  Ex. 35 at 1, Ex. 36 at 1, Ex. 37 at 1 (alleging infringement only through utilizing Akamai's or Level 3's CDNs).  Sound View has not sought any discovery from Amazon or Verizon regarding their CDNs, despite conceding that such discovery from any third-party CDNs was "required" to sustain its infringement claims.  Dkt. No. 124 at 22.  Dr. Richardson, Sound View's technical expert, offers no opinion at all on Amazon's or Verizon's CDNs infringement of the patents-in-suit.  Ex. 29 at i-x (Table of Contents).

Accordingly, Mr. Yurkerwich's August 3 damages figures, by his own admission, include activity (Hulu's streaming over Amazon or Verizon's CDNs) that is not accused of infringement in this case.  His failure to tie his damages opinions to the facts of the case, including the activity actually accused of infringement by Sound View, demonstrates his unreliable methodology.  The Court should exclude this testimony.  *Uniloc*, 632 F.3d at 1315.

**B.     Mr. Yurkerwich Applies A Dubious "Efficiency Factor," Calculated For Only One Hulu Program To Hulu's Entire Mobile And Web Division**

Sound View contends that Hulu's use of jQuery, a freely available open-source JavaScript software, infringes the '062 Patent.  Mr. Yurkerwich opines that Hulu "would have accepted the opportunity to be licensed" to the '062 Patent "for a lump sum of $9.3 million."  Ex. 53 at ¶ 223.  He reaches this opinion through an untenable attempt to "estimate the cost savings associated with implementing the '062 patent."  *Id.* at ¶ 213.

Mr. Yurkerwich's estimate of those cost savings rests on a single data point provided by one of Sound View's technical experts, Dr. Meldal.  Dr. Meldal's report identifies 13 different pieces of Hulu source code produced during this litigation that utilized jQuery in some manner.  Ex. 47 at ¶¶ 55-67.  According to Dr. Meldal's reasoning, "by counting the number of times Hulu uses a particular jQuery method and multiplying that value by the number of lines of JavaScript code that method replaces in the particular jQuery library being used, I am able to estimate the number of lines of code Hulu would have needed to author had it been unable to infringe the '062 patent."  *Id.* ¶ 73.

Dr. Meldal, however, did not count the number of times Hulu uses a particular jQuery method.  Instead, he looked at **only one** of those 13 pieces of source code he had previously identified—Hulu's "Hudis" application.  *Id.* at ¶ 72 ("Also at my direction, Chain Identifier was run against **only** Hulu's Hudis code base.") (emphasis added).  Dr. Meldal then "divid[ed] the estimated additional lines of code" that he contended Hulu would need to write if it could not use jQuery "by the estimated number of non-comment lines **in Hulu's Hudis** web application."  *Id.* ¶ 73 n.82.

Dr. Meldal's calculations are based on an entirely illogical premise:  that in every instance in the Hudis source code where two jQuery operators are combined, Hulu would retype the underlying JavaScript for those jQuery operators each and

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

1 every time.  But there is no evidence that Hulu would have done so.  Hulu could

2 have, for example, simply copied and pasted the code after rewriting it the first

3 time, or created its own application without chained operators.  Such a common

4 sense approach would reduce Dr. Meldal's result from 22% to just 1.1%.

5 Declaration of Mark E. Crovella, Ex. A ("Crovella Rep.") ¶¶ 157-162.

6        Mr. Yurkerwich takes Dr. Meldal's already dubious calculations and pushes

7 them even farther.[2]  Mr. Yurkerwich mischaracterizes this 22% data point

8 calculated **solely** for the Hudis source code as an "efficiency factor" that he applies

9 *to the personnel costs of Hulu's entire "Mobile and Web" division over a period of*

10 *five years*.  Ex. 53 at ¶ 217 and Ex. 5.0.  Mr. Yurkerwich testified that he had no

11 basis for applying Dr. Meldal's 22% data point to any system other than the Hudis

12 source code.  Ex. 57 at 84:21-24.[3]  Yet he made no attempt to apportion his

13 calculations between mobile and web activities that do not involve the Hudis source

14 code.  *Id.* at 84:21-86:22.  He made no attempt to account for mobile and web

15 activities that do not use jQuery.  *Id.* at 89:3-90:15.  He made no attempt to account

16 for mobile and web activities that do not involve programming at all.  *Id.*  Instead,

17 Mr. Yurkerwich relies on one dubious data point calculated for the lines of code in

18 one piece of source code to opine that Sound View should be entitled to 22% of **all**

19 of Hulu's entire mobile and web division personnel costs for a five year period.

20        Mr. Yurkerwich's opinion regarding the appropriate amount of damages for

21 the '062 Patent bears no relationship to the accused technology, much less to any

22 benefit provided by the '062 Patent.  Because Mr. Yurkerwich bases his opinion on

23

---

24 [2] Whether Mr. Yurkerwich ever actually discussed this premise with Dr. Meldal is
doubtful, as reflected in Dr. Meldal's own deposition testimony.  Ex. 48 (Meldal

25 Tr.) at 13:17-22 ("Q. Any other expert have you -- that you have spoken to in this

26 litigation?  A. No.  Q.  No.  Have you heard of a person named David Yurkerwich?
A. No.").

27 [3] ("Q.  Is your damages number -- do you have a basis for applying that 22 percent

28 to any system other than Hudis?  A.  I don't think I have.").

HULU LLC'S  MOTION TO  EXCLUDE THE
TESTIMONY OF DAVID YURKERWICH
CASE NO. LA CV17-04146 JAK (PLAx)

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

unreliable methodology, the Court should exclude his opinion regarding damages for the '062 Patent.

**C. Mr. Yurkerwich Purports To Calculate The Value Of "Adaptive Streaming" In Moving Cars With No Helper Servers, But Ignores Any Alleged Value Of The Patented Technology Of The '213 Patent**

Sound View contends that Hulu's streaming of SVOD and Live traffic in MPEG-DASH and HLS format infringe Claim 16 of the '213 Patent. Mr. Yurkerwich, in a heavily flawed analysis, attempts to place a value on these claims by relying on what he calls "adaptive streaming." Ex. 53 at ¶ 238. His conclusion, that Hulu would have agreed to pay a "reasonable royalty" in excess of $113 million for a license solely to Claim 16 of the '213 Patent, relies on a flawed analysis of an irrelevant study. *Id.* at ¶ 291.[4]

First, Mr. Yurkerwich's premise—that "adaptive streaming" provides a "measure of the benefit" of the patents—is false. *See* Ex. 57 at 119:12-18.[5] He relies on his discussions with Dr. Richardson for this premise. Ex. 53 at ¶ 238. Dr. Richardson's opinions, however, considered "adaptive bitrate protocols," not "adaptive streaming." According to Dr. Richardson, "[i]f you say 'adaptive streaming,'" on the other hand, "it could refer to a lot of other things." Ex. 49 at 139:14-15. This admission alone destroys Mr. Yurkerwich's underlying premise.

Second, Mr. Yurkerwich purports to rely on Dr. Richardson opinion that "the '213 patent's *incremental value* to Hulu can be measured by examining the effect on streaming quality Hulu would experience *if it were to revert to a non-adaptive bitrate protocol*." Ex. 29 at ¶ 854 (emphasis added). However, Dr. Richardson

---

[4] In his "Corrected and Alternate Calculations," Mr. Yurkerwich still calculates an "Alternate Scenario Damages" in excess of $83 million for this claim. Ex. 55 at Exhibit 5.5.

[5] "Q. Are we starting with adaptive streaming versus non-adaptive streaming and then trying to figure out a value of that to Hulu, is that your approach? … A. We're using that benchmark, if you will, as a measure of the benefit of the patent."

does **not** suggest "adaptive bitrate protocol" represents the contributions of the '213 Patent over the prior art, nor does he attempt to apportion the benefits allegedly provided by the '213 Patent over the prior art systems that existed at the time.  In fact, he disclaims any such relationship:  "Q. Is it your opinion that '213 Patent -- that prior art before the '213 Patent did not describe an adaptive bit rate protocol?  A.  I don't recall expressing that opinion.  Q.  Is that your opinion sitting here today?  A.  So an adaptive bit rate protocol could cover perhaps other examples.  I think we might have discussed some earlier today.  So, you know, I wouldn't necessarily agree with that opinion."  Ex. 49 at 207:2-13.

Third, the study Mr. Yurkerwich relies upon to determine the purported "benefit" of adaptive streaming to Hulu is untethered from the accused technology.  The study, entitled, "Empirical Evaluation of HTTP Adaptive Streaming under Vehicular Mobility," focuses on the potential benefits of adaptive bit rate technology "*in the context of vehicular mobility*, where a viewer on a moving vehicle watches the video stream on a mobile device (phone, tablet or laptop) connected to the Internet *via a WWAN connection*."  Ex. 58 at SVI-HULU00032737 (emphasis added).  The study itself contrasts this context to a more traditional one for consuming streaming video, such as where "the viewer is connected via a wired connection, which has high and fairly stable bandwidth."  *Id.*  The study uses the unique—and totally irrelevant here—scenario of a moving vehicle connected over a wireless wide area network (WWAN) connection using cellular modems "housed in the boot of a car" traveling through Sidney, Australia.  *Id.* at SVI-HULU00032742.  Even Dr. Richardson concedes that the study "does not make use of a CDN," and thus does not even include a helper server, a required element of each of the asserted claims of the '213 Patent.  Ex. 29 at ¶ 858.

Despite these fundamental differences, Mr. Yurkerwich makes no attempt to relate the benefits of adaptive bitrate technology for the cell phone in the study to the benefits for a computer, tablet, or television.  Mr. Yurkerwich makes no attempt

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

to relate the benefits of adaptive bitrate technology to the WWAN network signal in the study to the benefits for a WiFi or wired cable connection.  Mr. Yurkerwich makes no attempt to relate the benefits of adaptive bitrate technology for the study's receiver housed in the boot of a moving car in Australia to the benefits to a Hulu user in the U.S. sitting in his home.  In short, Mr. Yurkerwich does nothing to relate the benefits of adaptive bit rate technology in the inapplicable context of this study to Hulu's U.S. users.

Nevertheless, Mr. Yurkerwich adopts the benefits from this study wholesale, and uses them as the foundation of his inflated damages calculation.  *See, e.g.,* Ex. 57 at 118:4-5 ("I was using this study as a benchmark for measuring the benefits of the '213 patent.").  From this study, Mr. Yurkerwich assumes that "the '213 Patent reduces buffering durations by 70% and the number of events by 80%" for Hulu's users.  Ex. 53 at ¶ 263.  Mr. Yurkerwich combines these percentages with other dubious statistics to conclude that "without the patent, Hulu would lose 4.98% of its initial audience from a startup delay alone," would lose "14.66% of the audience" due to rebuffering events, and would suffer a "9.82% impact on advertising revenue."  *Id.* at ¶¶ 264-266.  From this, Mr. Yurkerwich concludes that the "[t]he net present value of the potential loss of advertising and subscription revenue during the period of infringement would have been approximately $447 million."  *Id.* at ¶ 279.

As in the recent *Apple v. Wi-LAN* decision, Mr. Yurkerwich's "starting point" for his damages calculation is not the patented technology, but "benchmarks" pulled from an irrelevant study about a cell phone in the boot of a car in Australia.  *Apple, Inc. v. Wi-LAN, Inc.*, Slip Op. at 7.  Mr. Yurkerwich did not even attempt to calculate the benefits of the patented technology.  *Id.*  Such an analysis is not "based on sufficient facts or data" and is not "the product of reliable principles and methods," and thus fails to meet the baseline for admissibility under Rule 702 and *Daubert*.

**D.    Mr. Yurkerwich Makes Baseless And Speculative Assumptions About Alcatel-Lucent's Role In The 2010 Hypothetical Negotiation**

Mr. Yurkerwich compounds his flawed methodology by making a baseless assumption about Alcatel Lucent, the owner of the '213 Patent during the 2010 hypothetical negotiation for Claim 16 of the '213 Patent.  Mr. Yurkerwich refers to the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 53 at ¶ 227. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 228. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See, e.g.,* Ex. 54 at ¶ 18.

However, Mr. Yurkerwich's analysis of damages for the '213 Patent assumes, without any explanation, that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is *identical* to "the share of the economic benefit (that is, increased revenue) Alcatel would have accepted in a hypothetical negotiation with Hulu."  Ex. 53 at ¶ 228.  This percentage directly impacts Mr. Yurkerwich's ultimate opinion regarding the reasonable royalty for the '213 Patent:  "To calculate the actual damages due to Sound View, I have observed the full damages resulting from my analyses described above and applied a rate of

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

█████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████." *Id.* ¶ 275.

Mr. Yurkerwich provides no basis or support for his speculative assumption that Alcatel Lucent, in 2010, would have sought (or that Hulu would have agreed to) ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████ In other words, ███████████████████████████████████████████████

█████████ says nothing about the percentage of the "economic benefit" of Claim 16 of the '213 Patent to which Hulu and Alcatel Lucent would have agreed to. Mr. Yurkerwich's assumption ███████ constitutes the portion of the "economic benefit" that Alcatel Lucent would seek is pure speculation. Such "layered assumptions lack the hallmarks of genuinely useful expert testimony," and are another reason the Court should exclude Mr. Yurkerwich's calculation of damages. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1373-74 (Fed. Circ. 2013).

**E.** **Mr. Yurkerwich Copies His Flawed Calculations From The 2010 Hypothetical Negotiation To A 2017 Hypothetical Negotiation Involving Different Parties, Patents, And Technology**

Sound View alleges that Hulu's Live product (but not its SVOD product) infringes Claims 1, 7, and 8 of the '213 Patent, and Claims 1, 2, 13, 27, and 29 of the '796 Patent. Accordingly, Mr. Yurkerwich opines that Sound View and Hulu

would have conducted a separate hypothetical negotiation for these patents upon the launch of Hulu's Live product.  Ex. 53 at ¶ 288.[6]

Mr. Yurkerwich provides a flawed opinion as to the appropriate amount of damages stemming from the alleged infringement of these claims for the same reasons discussed above with regard to Claim 16 of the '213 Patent.  *See supra* at Section IV.B and IV.C.  That is because Mr. Yurkerwich incorporates all of the flaws of his analysis for the '213 Patent's Claim 16—including reliance on the irrelevant "vehicular mobility" study and his baseless speculation about the licensing revenue Alcatel Lucent would accept—into his attempts to calculate damages for the other claims of the '213 Patent and for the '796 Patent.

Mr. Yurkerwich concedes that this hypothetical negotiation would have occurred in May of 2017, rather than July of 2010, as it did for Claim 16 of the '213 Patent.  Ex. 53 at ¶ 288.  He concedes that the parties would be Sound View and Hulu, rather than Alcatel Lucent and Hulu.  *Id*.  Yet in a different hypothetical negotiation seven years later, involving different parties, different patents, and different technology, Mr. Yurkerwich states that he "believe[s] the parties would have used the same metrics they applied in the 2010 negotiation."  *Id*.  As a result, he concludes that in this 2017 hypothetical negotiation "Sound View would demand at least $3.5 million at the ▮▮▮▮▮▮ given the same considerations in the '213 negotiation and their obligation to make payments at that level to Alcatel Lucent."  *Id.* at ¶ 289.

Mr. Yurkerwich's only basis for this assumption is "conversations with Dr. Richardson," where he says Dr. Richardson explained "that the '796 Patent describes an enabling technology while the '213 Patent offers improved efficiency

---

[6] Mr. Yurkerwich's contention that Hulu would have conducted two separate hypothetical negotiations for a license to the '213 Patent is another flawed aspect of his methodology.  Mr. Yurkerwich does not identify any instance of either party conducting two separate hypothetical negotiations for the same patent.

and quality as compared to the prior art." *Id.* at ¶ 274.  This is a flawed analysis, as Mr. Yurkerwich is attempting to calculate the damages stemming from the alleged infringement of claims from **both** the '213 and '796 Patents.

Moreover, Mr. Yurkerwich bases his opinion on damages for seven of the ten asserted claims in this case on nothing more than a bare assumption that the "same metrics" should apply to two entirely different hypothetical negotiations.  He provides no analysis of the purported benefits of the technology in these claims. Nor does Mr. Yurkerwich analyze how Hulu might value those purported benefits differently for its Live Product in 2017 versus its SVOD product in 2010.  He provides no analysis of the different positions of Sound View negotiating for a license to the patents in 2017 versus Alcatel Lucent negotiating for a license to the patents in 2010.  He offers no basis ███████████████████████████ ███████████████████████████████████████████████ would similarly impact the amount of the purported "economic benefit" that Sound View would seek from Hulu.

Far from being the product of "sufficient facts or data" or "reliable principles and methods," Mr. Yurkerwich's opinion as to damages from these seven claims of the '213 and '796 Patents rests on nothing more than *ipse dixit* conclusions, and are not admissible under Rule 702.

### F.   Mr. Yurkerwich Uses The Benefits Of a 2018 Technology To Value The Year 2000 Techniques Of The '074 Patent

For the '074 Patent, Mr. Yurkerwich once again bases his calculations on a study having no relationship to the patented technology or Hulu's accused services. Mr. Yurkerwich states he was "advised by Dr. Richardson that the '074 benefits are consistent with the findings in a 2018 study titled 'Generalization of LRU Cache Replacement Policy with Applications to Video Streaming.'"  Ex. 53 ¶ 242.  Mr. Yurkerwich also states that "[a]ccording to the study, the average amount of time which playback of a video is delayed is improved by 29% when *using techniques*

*similar to those taught* by the '074 patent."  *Id.* at ¶ 242 (emphasis added).

This conclusion is dead wrong.  There is no dispute that the technique described in this 2018 study is different from the patented technology of the '074 Patent.  In his deposition, Mr. Yurkerwich stated that by "consistent," he meant that Dr. Richardson "felt that the study was a fair benchmark for measuring the benefits of the '074 patent." Ex. 57 at 147:8-12.  However, Mr. Yurkerwich conceded that the technique described in the study was different from the patented technology, *id.* at 148:3-20, and in fact conceded that he did not know if the patented technology was closer to the "gLRU" technique described in the study, or to the existing "LRU" technology against which it was compared, *id.* at 149:11-21.[7]

Mr. Yurkerwich made no attempt to account for any of these differences between the technique described in the 2018 study and the patented technology contained in the nearly 20-year old '074 Patent.  Instead, Mr. Yurkerwich once again adopted the benefits of the study wholesale, without any attempt to adjust this "proxy" to reflect the actual benefits of the '074 Patent.  Mr. Yurkerwich calculated damages for the '074 Patent by assuming that the study's finding—that its "gLRU" technique reduced playback delay by 29%—applied equally to the patented technique of the '074 Patent.  Ex. 53 at ¶ 270 ("Therefore, I have estimated the reduction in buffering for the '074 Patent to be 29%.").  He uses this number to directly calculate a purported "advertising revenue impact of 1.05%, and a subscription revenue impact of .21%."  *Id.* ¶ 271.

Mr. Yurkerwich's failure to make any attempt to account for the differences between this "proxy" and the actual patented technology of the '074 Patent is yet another example of his unreliable and flawed methodology.

---

[7] Dr. Jeffrey Chase analyzed this study and concluded that it did not disclose a number of limitations present in the claims of the '074 Patent.  Declaration of Dr. Jeffrey Chase, Ex. A ("Chase Rebuttal Report") at ¶ 285.

G.   **Mr. Yurkerwich Relies On a Flawed And Irrelevant 2018 Survey Of Hulu Users To Attempt To Determine The Value Of The '213 Patent To Hulu In A 2010 Hypothetical Negotiation**

While he does not rely on to value the patents-in-suit,[8] Mr. Yurkerwich's report discusses a survey conducted by Dr. Jeffrey Stec. *See* Ex. 53 at ¶¶ 281-283. Dr. Stec testified that he conducted this survey over the course of July 29 to July 31, 2018 (*see* Ex. 61 at 11:2-5), and the results of the survey are dated August 3, 2018, the same date that Mr. Yurkerwich issued his report. Ex. 62 (Stec Report) at Cover.

Dr. Stec's survey tested a remarkably narrow sample of people and features. The "target population" was "U.S. consumers and potential consumers of Hulu" who, within the last twelve months (i.e., since July 2017) either "were a subscriber of Hulu" or "planned to shop for or subscribe to Hulu." Ex. 62 at 8. The study purports to survey its population's willingness to pay varying levels of subscription fees for either Hulu Plus, Netflix, or Amazon Prime based on variations in eight attributes of those services: (1) Brand; (2) Picture Quality; (3) Simultaneous Streams; (4) Ability to Download Content; (5) Timing of Content Updates; (6) Video Rebuffering; (7) Video Start Time; and (8) Subscription Price. *Id.* at 9-10.

Dr. Stec's survey is notable for what attribute is *not* factored into its target population's choices. Dr. Stec's survey asked users to assume that the *content* available was "the same for all given OTT services." Ex. 61 at 128:5-129:14. Content, however, is frequently cited as one of the most compelling factors in a customer's (or potential customer's) decision whether to subscribe to a streaming service. *See, e.g.,* Ex. 62 and exhibits 12.1, 12.2, 12.3 thereto. Indeed, Dr. Stec's own attempt to compile the "Key Features" of Hulu, Netflix, and Amazon revealed that users cite "content," "exclusive content," or "original content" as "key

---

[8] See Ex. 57 at 150:7-10 ("Q. Do you use the results of Dr. Stec's report in your calculation of a reasonable royalty for any of the streaming media patents? A. I do not.").

features" of those services *more frequently than any other feature*.  Ex. 61 at 197:14-198:13.  Content, however, is notably absent from Dr. Stec's list.

Furthermore, Mr. Yurkerwich attempts to apply Dr. Stec's survey *from July of 2018* to a hypothetical negotiation that took place in July of 2010.  Mr. Yurkerwich opined that, during the hypothetical negotiation for the '213 Patent in July 2010, "Hulu would weigh this potential loss of revenue with other data about customer behavior in the OTT market."  Ex. 53 at ¶ 281.  Mr. Yurkerwich states that he attempted to "simulate" that potential loss by relying on Dr. Stec's survey, and Dr. Stec's survey showed that, without the '213 Patent, the resulting increase in rebuffering rates would mean "Hulu could have lost almost ██████████ in revenue from its Hulu Plus customers (which existed only from 2015-2018)."  *Id.* at ¶¶ 281-282.

Dr. Stec's report says nothing about Hulu Plus customers from 2015-2018, and certainly nothing about how Hulu would have weighed any customer loss in July 2010.  Dr. Stec's "target population" was limited to those who subscribed to Hulu or who had considered subscribing to Hulu between July 2017 and July 2018.  And he inquired as to their *present-day* expectations of streaming technology and rebuffering rates.  Accordingly, Mr. Yurkerwich's reliance on Dr. Stec's survey is a flawed methodology that fundamentally misinterprets the survey itself.

**H.    Mr. Yurkerwich Fails To Account For The Difference Between Direct Infringement And Induced Infringement**

Mr. Yurkerwich's analysis fails to account for the fact that Sound View's allegations of *indirect* infringement are limited to a start date of October 10, 2016 for the '213 Patent, a start date of March 28, 2017 for the '074 Patent, and a start of May 22, 2017 for the '796 Patent.  As discussed in Hulu's Motion for Summary Judgment of No Direct Infringement and Partial Summary Judgment of Limited

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

1  Induced Infringement of U.S. Patent Nos. 6,708,213, 6,757,796, and 9,462,074,[9] to

2  the extent the accused method steps of all asserted claims of these three "CDN

3  Patents" are performed at all, they are all performed by the edge servers of third

4  parties Level 3 and Akamai, and none are performed by Hulu.  Accordingly, Hulu

5  cannot properly be found to directly infringe these patents—Sound View's claims

6  should be limited to induced infringement under 35 U.S.C. § 271(b).  *Rearden LLC*

7  *v. Walt Disney Co.*, 293 F. Supp. 3d 963, 973 (N.D. Cal. 2018); *Finjan, Inc. v.*

8  *Sophos, Inc.*, 244 F.Supp.3d 1016, 1044 (N.D. Cal. 2017).  Because, as a matter of

9  law, no act of ***induced*** infringement can occur before Hulu had notice of the CDN

10  Patents, no damages for the alleged induced infringement are available before

11  October 10, 2016 (for the '213 Patent), March 28, 2017 (for the '074 Patent), and

12  May 22, 2017, for the '796 Patent, at the earliest.[10]

13  Mr. Yurkerwich offers no opinion as to the appropriate damages for the '213,

14  '796, and '074 Patents based on the alleged dates of first infringement (and thus the

15  hypothetical negotiations) beginning on these dates.  *See, e.g.,* Ex. 53 at ¶ 291.

16  Indeed, Mr. Yurkerwich does not opine as to indirect infringement at all.

17  Accordingly, should Hulu's request for summary judgment of no direct

18  infringement be granted, Mr. Yurkerwich's opinions as to the appropriate damages

19  resulting from the alleged infringement of these three patents would be irrelevant as

20  to any issue in this case.  *See, e.g., Parallel Networks Licensing LLC v. Int'l*

21  *Business Machines Corp.*, 2017 WL 1405155 at *2-3 (No. 13-2072 (KAJ) D. Del.

22  Apr. 17, 2017) (excluding expert testimony because it "reveals no developed

23  damages theory that pertains to the theory of direct infringement.")

24

25

26  _____

27  [9] Filed concurrently herewith.

28  [10] The aforementioned Motion for Summary Judgment, filed concurrently herewith,
describes in detail the grounds for these arguments.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

**V.**     **CONCLUSION**

Mr. Yurkerwich's opinions will not help the jury understand the evidence or determine a fact in issue.  Mr. Yurkerwich does not base his opinions on sufficient facts or data.  Nor are his opinions the product of reliable principles and methods. Hulu therefore respectfully requests that the Court exclude Mr. Yurkerwich's damages opinions under Fed. R. Evid. 702.


Dated:  March 4, 2019

O'MELVENY & MYERS LLP
BRETT J. WILLIAMSON
JOHN C. KAPPOS
CAMERON W. WESTIN
BO K. MOON
BRADLEY M. BERG


By:  _/s/ Brett J. Williamson_

Brett J. Williamson
Attorneys for Defendant and
Counterclaim-Plaintiff
HULU, LLC